[Cite as *Ferguson v. Univ. Hosp. Health Sys., Inc.*, 2022-Ohio-3133.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

RICHARD FERGUSON,                           :

    Plaintiff-Appellant,              :

                                   No. 111137

    v.                                :

UNIVERSITY HOSPITALS                        :
HEALTH SYSTEM, INC.,

                                   :

    Defendant-Appellee.

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 8, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-20-933188

---

### *Appearances:*

Nilges Draher LLC and Christopher J. Lalak; Max W. Thomas, LLC and Max W. Thomas, *for appellant*.

Perez & Morris LLC, Kerin Lyn Kaminski and Karen L. Giffen, *for appellee*.

EILEEN A. GALLAGHER, J.:

{¶ 1} Plaintiff-appellant Richard Ferguson appeals an order of the Cuyahoga County Court of Common Pleas granting summary judgment on his claims in favor

of defendant-appellee University Hospitals Health System, Inc., d.b.a. University Hospitals Portage Medical Center.[1]

{¶ 2} The trial court did not commit reversible error when it failed to set forth detailed reasoning for its decision, and University Hospitals was entitled to summary judgment. We therefore affirm.

## I. Factual and Procedural Background

{¶ 3} Based on the record before us,[2] the material facts of this case are not in genuine dispute.

---

[1] We refer to University Hospitals Health System, Inc. as "University Hospitals" or "UH." When referring specifically to UH's Portage Medical Center facility, formerly known as Robinson Memorial Hospital, we use that specific entity's former name — "Robinson" — for clarity.

[2] Ferguson's brief in opposition to the motion for summary judgment in the trial court refers to an "Exhibit A" to the brief, which the brief describes as an affidavit by Ferguson. The exhibits to Ferguson's opposition brief include documents labeled as exhibits to such an affidavit. University Hospitals' reply brief in the trial court also briefly refers to such an affidavit. But it does not appear that any affidavit by Ferguson was ever filed in the trial court, either on the public docket or under seal, and no such affidavit is contained in the record on appeal. Ferguson filed the affidavit's *exhibits*, and he filed an Exhibit B to the brief in opposition; but based on the appellate record he does not seem to have filed an "Exhibit A" — the affidavit itself. It is the appellant's duty to ensure the completeness of the record on appeal. *E.g.*, *O'Donnell v. Northeast Ohio Neighborhood Health Servs.*, 8th Dist. Cuyahoga No. 198541, 2020-Ohio-1609, ¶ 75, fn. 6 ("The appellant has a duty to ensure that the record relating to his or her assignments of error is complete."); *Pietrangelo v. Hudson*, 2019-Ohio-1988, 136 N.E.3d 867, ¶ 22 (8th Dist.) ("It is the appellant's duty to ensure that this court is provided with all of the information needed to decide an assignment of error.") Accordingly, we must presume that any such affidavit was not filed, and the trial court did not consider any such affidavit. We make our decision in this matter based on a thorough review of the Civ.R. 56(C) materials in the record; those materials do not include an affidavit from Ferguson.

## A. Ferguson worked for Robinson Memorial Hospital, which merged with University Hospitals

{¶ 4} Richard Ferguson worked as a registered nurse at Robinson Memorial Hospital ("Robinson") in Ravenna, Ohio, for over twenty years. He was competent at his job, well-liked by his colleagues and his supervisors gave him good performance reviews. In late 2015, Ferguson was working eight-hour shifts as a "floater" staff nurse on the floor of the hospital's Medical-Surgical department. He "floated" between the Medical-Surgical department's two floors based on any given day's patient complexity and staffing levels.

{¶ 5} The job description for a staff nurse in the Medical-Surgical department lists education, licensure and experience requirements. In addition, the description identifies that a staff nurse's major responsibilities include, among other things, "adhere[nce] to organizational policy and procedure." The job description does not specifically identify the hours or shifts a staff nurse must work. A previous version of the job description, attached to Ferguson's brief in opposition in the trial court, identified that this responsibility includes, among other things, "adhere[nce] to the attendance policy" and "adhere[nce] to scheduled work hours as per department and hospital policy and procedures."

{¶ 6} University Hospitals acquired Robinson in 2015 and assumed management of the facility. Robinson's vice president of human resources testified that the merger with University Hospitals "was a long, involved process" of changing to UH's policies, procedures and systems. He described the transition as a "very, very challenging time." Ferguson described that there was a lot going on during the

transition, there was some confusion and Robinson's employees and managers had to learn "a protocol and a procedure for every little thing." Among other changes, University Hospitals converted Robinson to a new definition of full-time employment and changed the facility's nurse-staffing model.

{¶ 7} Prior to the merger, Robinson Memorial Hospital defined full-time employment to include those employees hired to work 32 to 40 hours per week, and Robinson's Medical-Surgical department operated on an eight-hour-shift model for nurse staffing. University Hospitals, on the other hand, required employees to work at least 35 hours per week to be considered full-time and generally used a 12-hour-shift model for nurse staffing at its hospitals.

{¶ 8} In late 2015, University Hospitals announced that Robinson would be adopting UH's definition of full-time status effective January 1, 2016. To accomplish this change, UH communicated that Robinson's various departments would immediately reevaluate staffing models to incorporate more positions working at least 35 hours per week. UH also announced that current Robinson employees hired to work between 32 and 34 hours per week would be "grandfathered" and retain full-time status — with the accompanying benefits of a full-time position — until December 31, 2016. An employee would no longer be "grandfathered" if the employee began working more than 35 hours per week or less than 32 hours per week.

{¶ 9} In addition to this change, which affected all Robinson employees, Robinson converted to UH's 12-hour-staffing model for nurses. In late 2015, the

Medical-Surgical department announced that it would require all its nurses to work 12-hour shifts because of the merger. Most registered nurses would be working all 12-hour shifts immediately after the effective date of the transition and all weekend shifts would be 12 hours. The department communicated that there may be a limited number of "combo" shifts available, where nurses would work some eight-hour shifts on weekdays (Monday through Friday) and 12-hour shifts on weekends (Saturday and Sunday). The department intended this "combo" shift to be temporary, either phased out through attrition or when the department was ready to switch those positions to 12-hour shifts. As nurses working the "combo" shift vacated those positions for one reason or another, the department would eliminate those positions. The department ultimately phased out these "combo" shifts by the end of 2016.

{¶ 10} After the effective date of the transition — January 1, 2016 — the Medical-Surgical department did not permit any nurse to continue working all eight-hour shifts.[3] In fact, a nurse manager in the department averred that she was not aware of any nursing unit at Robinson that retained an all-eight-hour shift after the transition.

---

[3] Ferguson heard that one nurse remained on an all-eight-hour-shift schedule after the transition, but he could not provide details about that alleged situation, and he testified that "[u]nfortunately it could be gossip." Robinson's nurse managers in the Medical-Surgical department averred that no nurses in the department continued to work all eight-hour shifts, testimony that is consistent with UH's communications about the change and other documentary evidence in the record. Ferguson points to no evidence in the record that would demonstrate a genuine dispute as to whether any nurses in the department worked all eight-hour shifts after the transition.

**B. Ferguson requested an accommodation to work all eight-hour shifts and his doctor confirmed that he could not work longer than eight hours without experiencing pain and fatigue**

{¶ 11} In late November or early December 2015, after receiving notice of the change to 12-hour shifts, Ferguson made a request to Neil Everett — Robinson's vice president of human resources — that University Hospitals permit him to continue working all eight-hour shifts. Ferguson felt that 12-hour shifts would be too long for him because he has a clubbed foot, and if he works longer than eight hours, he gets what he described as a "sciatic-type" pain in his leg and has difficulty ambulating.[4]

{¶ 12} Everett conferred with nursing supervisors at Robinson about Ferguson's request. The nursing supervisors confirmed that all the nursing positions in the Medical-Surgical department required 12-hour shifts.

{¶ 13} Ferguson began working all 12-hour shifts after January 1, 2016.

{¶ 14} Everett informed Ferguson by email on January 5 that all department nursing positions involved 12-hour shifts. He told Ferguson that Ferguson could submit a formal Americans with Disabilities Act ("ADA") request for an accommodation. Everett attached a letter describing what UH needed to evaluate the request. Among other things, Ferguson needed to complete a form to "allow us to engage in an interactive process and to discuss your disability and/or medical condition with you" and have a health-care provider complete a certification form

---

[4] There is a dispute about whether Ferguson initially requested to remain on eight-hour shifts as a medical accommodation. Everett testified that Ferguson initially requested eight-hour shifts for nonmedical reasons, including pet-care responsibilities. At the summary-judgment stage, we resolve that dispute in Ferguson's favor.

"and describe how your medical condition affects your ability to perform the essential functions of your position."

{¶ 15} Ferguson understood from his conversations with Everett that, if he completed all the paperwork, "it shouldn't be a problem" to move Ferguson back to an all-eight-hour-shift schedule because he had "been a good employee and worked there for 22 years."

{¶ 16} Ferguson completed the paperwork around January 14, 2016. Specifically, he completed a request-for-reasonable-accommodation form stating that "working 12 hours is just too long of a day for me standing." Ferguson requested to "work 8 hours instead of 12 hours," and he stated that the need for an accommodation would be permanent. Ferguson also executed an authorization for his treating physician — Dr. Edward F. Jastrzemski — to provide "any necessary medical information" to University Hospitals "in order that it may evaluate my request for a reasonable accommodation * * *."

{¶ 17} Dr. Jastrzemski signed a provider-certification form around January 18, describing that "walking/standing for extended periods of time create ambulatory difficulty" for Ferguson. He indicated his opinion that Ferguson's disability affects Ferguson's ability to perform any one of the essential functions of his job, and specifically described that "walking or standing for more than 8 hrs a day can cause discomfort when ambulating." Dr. Jastrzemski indicated that there was an accommodation that would allow Ferguson to perform the essential functions of the job: "limit work day to 8 hours."

**C. UUH considered the request, concluded that it could not accommodate all eight-hour shifts and offered Ferguson a "combo" shift**

{¶ 18} After receiving Ferguson's formal request for accommodation, University Hospitals again investigated whether the Medical-Surgical department could reasonably accommodate an all-eight-hour-shift schedule for Ferguson. Specifically, Everett worked with the Medical-Surgical department leadership to see if the department could accommodate having Ferguson work all eight-hour shifts. The department determined that it could not accommodate an all-eight-hour shift in its staffing model.

{¶ 19} Chassidy Jones, a nurse manager in the Medical-Surgical department, averred as follows about the challenges of accommodating Ferguson's request:

> Scheduling eight-hour shifts on a 12-hour staffing model is disruptive to staffing and continuity of care to patients. When the eight-hour shift nurse leaves for the day, another nurse must cover the shift for the remaining four hours. If there is no available nurse, the nurse-to-patient ratio increases and patient care suffers.

{¶ 20} Sherry Sommers, another nurse manager in the department, similarly averred that "Medical-Surgical could not accommodate all eight-hour shifts, and patient care would have suffered if it had." Everett testified as to his understanding from the Medical-Surgical department leadership of the challenges of accommodating Ferguson the way Ferguson requested:

> Once you move to that model, it's, from a nursing perspective, it's really critical that we have all the handoffs report at the end of the shift to the next shift. You can't have those like during the shift.
>
> That's communication on the condition of your mother, you know, to the next nurse that's taking over care for her. It has to be very

organized. It's very regimented. You can't have people coming and going, nurses who are providing the care coming and going during a shift.

{¶ 21} Ferguson agreed that, if he were to work eight hours in a 12-hour staffing model, another nurse on the floor would likely have to pick up his patients when he left at the end of his shift. Ferguson testified that he does not know of any nurses that work four-hour shifts. He testified that normally he had no more than five patients per shift, and he continued as follows:

Q: So [the other nurses on the floor] would have a full complement of patients and then have to pick up one of yours for four hours, correct, one or two of yours?

FERGUSON: Correct.

Q: How many nurses usually worked on the floor?

FERGUSON: It depends on acuity how many, what the census is like. Anywhere, I would think, from three to five.

Q: So if it happens to be a day when there [are] three nurses working and you leave, the other two would have to pick up three or two patients, right?

FERGUSON: Right.

Q: In addition to the patients they already have, correct —

FERGUSON: Correct.

Q: — for four hours? Then if there [are] five, each person would have to pick up one patient, right, for four hours?

FERGUSON: Right.

{¶ 22} Ferguson testified that in over 22 years as a nurse, there were only three or four times where, during one of his eight-hour shifts, he was called upon to fill in for someone else for just two or three hours.

{¶ 23} In addition to being told that the department could not accommodate all eight-hour shifts for Ferguson, during his conversations with nursing supervisors, Everett was told that the Medical-Surgical department already informally accommodated Ferguson in two ways. Ferguson disputes both claims to some extent.

{¶ 24} First, Everett was told that the department did not schedule Ferguson on two consecutive days between Monday and Friday. Ferguson admits that "quite some time" before the merger he had told his department that he preferred not to work *three* consecutive days — not two — and his department had accommodated that request. The department continued to avoid scheduling Ferguson for three consecutive days after the switch to 12-hour shifts.

{¶ 25} Second, Everett was told that Ferguson's coworkers administered IVs to Ferguson's patients and helped him with his workload. Ferguson admits that he "wasn't the best IV starter," but says that he "hung all my own IVs." Ferguson denies that anyone helped manage his workload.

{¶ 26} Everett met with Ferguson on February 5, 2016 and explained that he had met with the leadership in the Medical-Surgical department. He explained that the department leadership had determined that they could not reasonably accommodate an all-eight-hour-shift schedule for Ferguson. Everett discussed with Ferguson that Ferguson could bid on other nursing vacancies at University

Hospitals — at Robinson and throughout UH's other facilities.[5] Ferguson told Everett that he preferred to remain at Robinson; he did not want to commute to another UH entity. Everett informed Ferguson that the Medical-Surgical department had four "combo" shift schedules, comprised of eight-hour shifts during the week and 12-hour shifts every other weekend. There was a pending vacancy in one of those positions, and while the department's plan was to eliminate these "combo" shifts through attrition (eliminating a position when the position was vacated for one reason or another), Everett informed Ferguson that a nurse manager and the director of nursing had offered that Ferguson could take that "combo" position to better meet Ferguson's needs. Ferguson initially accepted the "combo" position, but a few days later he changed his mind and turned down the position. Ferguson testified that at the time he accepted the position, he had not fully thought it through.

{¶ 27} After this meeting, Everett drafted a letter to Ferguson "to provide an update on your recent request for accommodation and to request continuing our discussion on your needs * * *." Everett went on vacation, and no one sent the draft letter to Ferguson. The draft letter in the record has a date of March 15. The final version, which Everett sent to Ferguson on April 8, appears identical to the draft but for the date. Between Everett's drafting this letter and his sending it to Ferguson,

---

[5] Ferguson admits that Everett told him he was eligible for and should look for other positions at Robinson and throughout UH that may meet Ferguson's physical restrictions. The extent of Everett's assistance beyond that, and the number and quality of available vacancies at the time, are disputed.

Dr. Jastrzemski sent more information to University Hospitals about Ferguson's condition.

{¶ 28} Specifically, on March 30, Dr. Jastrzemski transmitted a return-to-work authorization form to University Hospitals. On that form, he stated that "[patient] has clubbed foot, [patient] cannot work more than 8 hrs." Dr. Jastrzemski authorized Ferguson to return to work with significant limitations, including that he must work at least one-half of the shift sitting and could not lift greater than eleven to twenty pounds. Dr. Jastrzemski wrote that these restrictions are in effect permanently. Ferguson acknowledged at deposition that, by this form, Dr. Jastrzemski was certifying to UH that he could only return to work if these restrictions were met. Ferguson further testified that these restrictions were not compatible with the job he was doing as a staff nurse:

Q: That certainly doesn't describe the job you had as a floater, does it?

FERGUSON: As a staff nurse, no.

Q: Because you're standing and walking more than that, correct?

FERGUSON: Correct.

Q: It says no lifting greater than 11 to 20 pounds, and that again certainly doesn't describe your job as, what do you call it, a floor nurse?

FERGUSON: Yes.

Q: So you agree that doesn't describe what you did. You had to lift more than the 11 to 20 pounds, right?

FERGUSON: (Indicating.)

Q: Yes?

FERGUSON: Yes.

Q: That there should be no repetitively bending and stooping. I don't know, do you repetitively bend and stoop when you're working as a floor nurse?

FERGUSON: Yes.

**D. University Hospitals placed Ferguson on administrative leave and referred him for a fitness-for-duty evaluation, continuing to seek either medical clearance or some accommodation that would allow Ferguson to work 12-hour shifts**

{¶ 29} Everett's April 8, 2016 letter to Ferguson included a summary of the steps University Hospitals had taken up to that point to consider Ferguson's request, including summarizing the two alleged informal accommodations Everett understood were in place. The letter also said the following:

> At this point you have submitted physician documentation stating that you have restrictions preventing you from working 12-hour shifts and * * * allowing you to continue to work your schedule could compromise your health, patient safety or patient care. In order for UH Portage to allow you to continue to work your current 12-hour schedule, we must have physician documentation stating you can perform the essential functions of your Staff Nurse position at your current schedule; with or without reasonable accommodation. This can be obtained at our cost by sending you to a fitness-for-duty exam for an objective evaluation of your current physical status. If you are unable to perform the essential functions of your job, we may need to place you in medical leave of absence status. I would like to meet with you at your earliest convenience to discuss the situation, the fitness for duty exam and discuss the possibility of finding other reasonable accommodations that may satisfy your physical restrictions and allow you to continue to work in your Staff Nurse position.

{¶ 30} By this time, Ferguson had been working 12-hour shifts without incident or complaint for several months. Ferguson acknowledged at deposition that he understood that University Hospitals was not independently claiming he

could not perform the essential functions of his position, but rather Ferguson's own doctor was saying so:

> Q: He's telling you, look, this isn't really what we're saying. This is a result of what your doctor has told us, right?

> FERGUSON: Right.

{¶ 31} Ferguson never asked Dr. Jastrzemski to change his assessment of Ferguson's physical needs. Ferguson never discussed with the doctor whether any other accommodation would be acceptable other than working all eight-hour shifts.

{¶ 32} On April 18, 2016, Everett met with Ferguson and informed Ferguson in person that University Hospitals received documentation from Dr. Jastrzemski that necessitated that Ferguson be off work until a fitness-for-duty evaluation could be completed. Everett informed Ferguson that UH was placing Ferguson on leave and would pay him pending a determination on his fitness for duty. University Hospitals pays employees for up to 30 days pending the results of a fitness-for-duty evaluation.

{¶ 33} University Hospitals made a mandatory referral of Ferguson to UH's Employee Assistance Program around April 20 for this fitness-for-duty evaluation. Ferguson understood that the referral arose out of what Dr. Jastrzemski had said about Ferguson's medical limitations and UH's resulting concern about whether Ferguson was fit for duty as a staff nurse.

{¶ 34} Ferguson met with UH's Employee Assistance manager Jill Fulton on April 22. All employees referred to Employee Assistance undergo a toxicology screening, regardless of the reason for the referral. Fulton averred that in this

meeting Ferguson told her that he "had issues walking and standing and could not work a 12-hour shift." Her intake notes reflect that Ferguson denied performance issues at work, denied ever being sent a letter addressing performance issues and denied being issued corrective action for performance issues. Her intake notes reflect that UH would, as a next step, send a fitness-for-duty letter to Ferguson's doctor to reevaluate the concerns.

{¶ 35} The same day, Fulton attempted to call Everett about Ferguson's claim that Ferguson had not received certain letters, leaving a voicemail. Fulton expressed concern in an email that "[i]f the employee did receive these documents, my concern is either denial or cognitive issues."

{¶ 36} On April 25, Everett followed up on Fulton's voicemail by email, informing her that Ferguson was correct; Ferguson had not received the draft letter due to, among other things, Everett's vacation. Everett informed her that he had met with Ferguson, covered everything in the draft letter with him, went over the new medical information received from Ferguson's doctor and told him that he would need a fitness-for-duty exam. Everett assured Fulton "that [Ferguson] indicated that he understood why we are requiring the exam in our conversation." Everett also told Fulton that Jones was supposed to have sent her information about the "performance concerns." Fulton responded to Everett five minutes later, asking whether Ferguson ever received a performance-improvement plan or corrective action from his manager.

{¶ 37} On April 26, UH's Employee Assistance staff followed up with Dr. Jastrzemski to ask "for confirmation of the restrictions you initially provided." UH also asked the doctor "to comment on Mr. Ferguson's ability to perform the essential functions of his job." UH informed Dr. Jastrzemski in the letter that Ferguson was "very well-liked," there were minimal complaints about him, he reported being able to hang IV fluids and care for his patient load and he had been working 12-hour shifts. But UH said that Ferguson "needs to be medically cleared prior to returning," and if the doctor felt that Ferguson will need to be out of work for medical reasons, UH would provide a Family and Medical Leave Act ("FMLA") form and short-term-disability paperwork.

{¶ 38} The same day, Dr. Jastrzemski transmitted an FMLA physician certification to University Hospitals, repeating that Ferguson "may work up to 8 hours daily" and "has difficulty standing on feet over 8 hrs per day."[6]

### E. University Hospitals approved Ferguson's FMLA leave, denied his short-term-disability request and continued to suggest potential accommodations

{¶ 39} On May 2, Fulton referred the matter back to the human-resources department and notified Ferguson that his doctor did not change his return-to-work recommendation.

---

[6] It is not clear which of these communications went out first on April 26; that is to say, whether Dr. Jastrzemski was responding to UH's letter, or whether UH's letter was in response to Dr. Jastrzemski's FMLA form. If UH's letter went out after UH received the FMLA form, there is no evidence that Dr. Jastrzemski responded to the letter.

{¶ 40} Ferguson began approved FMLA leave on May 21. The leave ran to July 30, 2016.[7]

{¶ 41} On May 23, Ferguson's counsel sent a letter to Everett complaining about University Hospitals' approach to considering Ferguson's request for accommodation and advocating that University Hospitals return Ferguson to work "as a full-time RN working four 8-hour shifts per week."

{¶ 42} On June 14, Ferguson signed a short-term-disability-claim form identifying Dr. Jastrzemski as the "physician who advised you off work." Ferguson wrote "involuntary leave r/t fitness for duty" in the margins. He submitted the form to University Hospitals for consideration.[8]

{¶ 43} By letter dated June 14,[9] University Hospitals inquired of Dr. Jastrzemski as follows:

> Can Richard work a 12-hour shift with some form of accommodation, for example: additional or longer breaks/rest periods, some type of mobility device or other options that we can consider?
>
> What risk(s) does it pose to Richard if he works 12-hour shifts?
>
> Could he work a combination of 8- and 12-hour shifts?
>
> Are there any other options you could recommend if 12-hour shifts are the only work shifts available?

---

[7] It is not clear how or whether UH communicated this change in leave status to Ferguson in May. As discussed below, University Hospitals sent Ferguson a letter in August 2016 informing him that it had approved his request for FMLA leave from May 21 to July 30, 2016.

[8] For an unknown reason, "Nursing Oncology" is written in the margin next to the "Employee Information" section of the form.

[9] For an unknown reason, the letter refers to Ferguson seeking an accommodation for a position in "Nursing Oncology."

Are there any other possible accommodations that you can suggest that would allow Richard to work?

**{¶ 44}** Ferguson is copied on the letter. Ferguson and Dr. Jastrzemski never discussed UH's suggested accommodations. They never discussed, for example, whether periodic rest breaks would help Ferguson. They never discussed what the risks would be if Ferguson continued working 12-hour shifts.

**{¶ 45}** By letter dated June 21, Dr. Jastrzemski responded as follows:

I believe that longer breaks or rest periods will not likely benefit the employee/patient. He becomes fatigued after weightbearing for 8 hours. I am not certain whether a mobility device would be helpful for Richard. I firmly believe that working an 8-hour shift, as has been his regimen for the past several years, would be the best accommodation for him. If working a 12-hour shift is required, a functional capacity evaluation may be helpful, although this would not likely assess endurance.

**{¶ 46}** Ferguson testified at deposition that he agreed with his doctor's assessment that longer rest breaks or rest periods would not help him. Dr. Jastrzemski never suggested to Ferguson that he undergo a functional-capacity evaluation, and Ferguson never obtained one.

**{¶ 47}** Fulton explained that UH would send an employee for a functional-capacity evaluation if Employee Assistance and the employee's medical provider were to disagree about whether an employee can perform their job. She averred that there was no need for a functional-capacity evaluation here "because [Ferguson's] medical provider stated that he needed certain accommodations that University Hospitals could not provide."

{¶ 48} By letter dated July 7, Everett informed Ferguson that "[t]hrough conversations with you and your physician we have been unable to determine any accommodations that would allow you to return to your 12-hour shift schedule." As a result, "we are ending your Administrative (paid) Leave status effective today * * * as there is no reason to continue it." Everett informed Ferguson that he would need to request FMLA leave to maintain his employment status. Everett told him that if he took FMLA leave and was subsequently cleared to work 12-hour shifts in his position, Ferguson would be able to do so. Everett reminded Ferguson that he could also use the FMLA time to search for and bid on another UH position. And Everett informed Ferguson that Ferguson could apply for short-term disability if he was eligible for that benefit.

{¶ 49} Everett informed Ferguson on July 26 that Everett had spoken with Jones and Val Hennessy, Robinson's director of nursing, about Ferguson's request to explore options for a shift less than 12 hours long that would cover peak workload hours. Everett informed Ferguson that Jones and Hennessy had assessed whether it would be possible to accommodate such a "bridge nurse" position, but ultimately determined that no bridge nurse was needed in the unit and "the nurses on the unit are better utilized for the standard 12-hour shift." Everett explained the challenges of nurse staffing to Ferguson as follows:

> Considerable effort goes into ensuring that we have trained staff ready when needed for patient care, without over-staffing to patient volumes. It is a challenging balancing act where staff can become unhappy very quickly if they are sent home due to low volume/work load or mandated to pick-up during periods of high volumes.

**{¶ 50}** By letter dated August 12, 2016, University Hospitals informed Ferguson that his request for FMLA leave had been approved with a start date of May 21 and a return-to-work date of July 30, 2016. The letter states that if Ferguson does not return to work at the end of the FMLA leave, his position would no longer be secure. The letter informed Ferguson that if it was medically necessary to extend the leave, the leave could be converted to a medical leave of absence, but "it is your responsibility to ensure that you and/or your health care provider submit additional objective medical documentation to us supporting your extended disability request."

**{¶ 51}** On September 2, 2016, Dr. Jastrzemski transmitted a physician statement in support of Ferguson's claim for short-term disability. The doctor again repeated that Ferguson "is unable to work over 8 hours per day." He wrote that he had advised Ferguson "to maintain present work schedule of 8 hours per day." He described Ferguson's treatment plan as "may work 8 hours per day." He listed Ferguson's restrictions as "may work full time, 8 hours per day, 12-hour shifts are not recommended." He identified the duration of these restrictions as "lifetime."

**{¶ 52}** On September 12, 2016, University Hospitals informed Ferguson by letter that the information provided by Dr. Jastrzemski "does not support 'total disability' as defined under the UH Plan Document," and therefore UH was not approving Ferguson's application for short-term-disability benefits. The letter informed Ferguson that he could submit additional medical documentation for consideration within 180 days.

{¶ 53} University Hospitals claims that Ferguson voluntarily resigned by failing to return to work after his leave expired. Ferguson claims that University Hospitals placed him on an unpaid, involuntary leave and never let him come back to work, effectively terminating him. University Hospitals changed Ferguson's employment status in its system on September 6, 2019.

{¶ 54} Since leaving University Hospitals, Ferguson worked in various part-time positions, then moved to a nursing position at a hospital. In that role, he worked 12-hour shifts for a little over a year before shifting to eight-hour shifts.

## F. Ferguson filed suit, and the court granted University Hospitals summary judgment

{¶ 55} Ferguson filed a three-count complaint in June 2020 alleging that University Hospitals violated the Ohio Civil Rights Act, R.C. Chapter 4112 et seq., in its treatment of him. Specifically, Ferguson alleged that (1) University Hospitals took an adverse employment action against Ferguson as a result of an actual or perceived disability, (2) University Hospitals failed to reasonably accommodate his disability and (3) University Hospitals' termination of Ferguson's employment constituted retaliation for his request for reasonable accommodation.

{¶ 56} University Hospitals filed a motion for summary judgment and Ferguson filed a brief in opposition. The trial court granted the motion, stating its reasoning in two sentences:

> Defendants' [sic] Motion for Summary Judgment, filed 08/12/2021, is granted. The Court, having considered all the evidence and having construed the evidence most strongly in favor of the non-moving party, determines that reasonable minds can come to but one conclusion, that

there are no genuine issues of material fact, and that Defendants [sic] are entitled to judgment as a matter of law as to all claims.

{¶ 57} Ferguson appealed, raising the following two assignments of error for review:

First Assignment of Error: The trial court committed reversible error by granting University Hospitals' motion for summary judgment without addressing any of Ferguson's arguments to the contrary and without providing any legal reasoning or rationale for its conclusion.

Second Assignment of Error: The trial court erred in granting University Hospitals' motion for summary judgment as disputes of material fact exist with respect to Ferguson's disability discrimination, retaliation, and failure to accommodate claims.

## II. Law and Analysis

### A. First Assignment of Error

{¶ 58} Ferguson contends that the trial court's order granting summary judgment has impermissibly turned this court "into the trial court on appeal." Ferguson argues that reversal is warranted because the parties have raised numerous arguments and alternative arguments in their summary-judgment briefing, relying on hundreds of pages of evidence, and the trial court's order does not identify which of those arguments and what specific evidence were dispositive to the court's conclusions.

{¶ 59} In Ferguson's view, the lack of detail leaves ambiguity about why the trial court ruled the way it did and he suggests that this ambiguity also leaves doubt about whether the court adequately considered Ferguson's arguments. As an example of why he believes the trial court's order is improper, Ferguson relates that University Hospitals argued at the trial-court level that Ferguson failed to establish

that he was disabled, an element of his claims. University Hospitals has conceded that point for purposes of this appeal. By way of this example, Ferguson essentially asks how — in the absence of more detail from the trial court — this court would know if the sole reason the trial court granted summary judgment was that it accepted UH's argument on this now-conceded element.

{¶ 60} Because our review of the trial court's order is de novo, it would not matter if that were so.

{¶ 61} Our review of a trial court's grant of summary judgment is de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). We review the evidence "as if for the first time." *Argabrite v. Neer*, 149 Ohio St.3d 349, 353, 2016-Ohio-8374, 75 N.E.3d 161. We afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate. It is as if the motion and evidence therein is first reviewed at the appellate level. *Grafton* at 105; *Agrabrite* at ¶ 14. There is no requirement under Civ.R. 56 that a trial court provide reasons for its decision. *Sterling Contr. LLC v. Main Event Ent., LP*, 8th Dist. Cuyahoga No. 110965, 2022-Ohio-2138, ¶ 12 (citing *Medina ex rel. Jocke v. Medina*, 9th Dist. Medina No. 20CA0044-M, 2021-Ohio-4353, ¶ 22). And, because a motion for summary judgment does not involve factfinding, there is no requirement for findings of fact under Civ.R. 52. *Id.* (citations omitted).

{¶ 62} The cases Ferguson cites in support of his first assignment of error do not compel a different result.

{¶ 63} For example, the U.S. Supreme Court in *Kent v. United States* held, among other things, that a juvenile court's order waiving jurisdiction over a minor must contain a statement of the reasons motivating the waiver to comply with due-process standards and the District of Columbia's Juvenile Court Act. 383 U.S. 541, 561, 86 S.Ct. 1045, 47 L.Ed.2d 84 (1966). The court was not passing on appellate review in general; it decided what was required of juvenile courts in the unique context of waiving jurisdiction under the Juvenile Court Act.

{¶ 64} There is some support for Ferguson's position among Ohio Courts of Appeals decisions. Panels in the Ninth and Eleventh Districts have reversed grants of summary judgment because the trial court did not detail reasons for those decisions. *See Cty. Risk Sharing Auth. Inc. v. State*, 11th Dist. Geauga No. 2021-G-0014, 2022-Ohio-164, ¶ 15; *Mourton v. Finn*, 9th Dist. Summit No. 26100, 2012-Ohio-3341, ¶ 8–9; *Covender v. State*, 9th Dist. Lorain No. 18CA011355, 2019-Ohio-3715, ¶ 8–10; *cf. Dugan v. McDonald*, 11th Dist. Trumbull No. 2019-T-0073, 2020-Ohio-1441, ¶ 23 (affirming summary judgment where the trial court's entry "includes sufficient detail as to the basis for its decision * * *."). Panels in the Fourth and Tenth Districts have also reversed when a trial court considered an argument under an erroneous legal standard or did not consider an argument briefed by the parties, decisions which suggest that an appellate court needs to know the trial court's reasons for a summary judgment to provide meaningful review. *See Lang v.*

*Holly Hill Motel, Inc.*,[10] 4th Dist. Jackson No. 05CA, 2005-Ohio-6766, ¶ 22–23; *Stratford Chase Apts. v. Columbus*, 137 Ohio App.3d 29, 32–33, 738 N.E.2d 20 (10th Dist.2000). Finally, a panel in the Seventh District reviewed a grant of summary judgment without remand, but strongly encouraged trial courts to explain their reasoning because "[t]he trial court's judgment entry and reasoning are part of the de novo review process" and "the trial court's analysis often has a persuasive effect during appellate review." *Scassa v. Dye*, 7th Dist. Carroll No. 02CA0779, 2003-Ohio-3480, ¶ 21.

{¶ 65} With due respect to, and after consideration of, these nonbinding conclusions, there is no reason to remand in this case.

{¶ 66} This line of cases largely relies on the Ohio Supreme Court's opinion in *Murphy v. Reynoldsburg*, 65 Ohio St. 3d 356, 604 N.E.2d 138 (1992). In *Murphy*, the court reversed a summary judgment when the trial court admittedly ruled solely based on the parties' oral argument, without reviewing the summary-judgment briefing or the evidence in the record. *Murphy* at 360. *Murphy* makes clear that Civ.R. 56(C) requires the trial court to "thoroughly examine all appropriate materials filed by the parties before ruling on a motion for summary judgment." *Id.* If the trial court fails to do so, *Murphy* says there is reversible error notwithstanding that an appellate court would review the judgment de novo. *Id.* *Murphy* says

---

[10] After the Ohio Supreme Court's decision in *Argabrite* — 149 Ohio St.3d 349, 2016-Ohio-8374, 75 N.E.3d 161 — a panel of the Fourth District questioned its conclusion in *Lang v. Holly Hill*. *See Hoffman v. Gallia Cty. Sheriff's Office*, 4th Dist. Gallia No. 17CA2, 2017-Ohio-9192, ¶ 27 fn. 4.

nothing about how extensively a trial court — after thoroughly examining all appropriate material — must explain its decision to grant summary judgment.

{¶ 67} Here, no party asserts, let alone demonstrates, that the trial court failed to adequately consider any Civ.R. 56(C) material.[11] The trial court specifically stated that it was granting summary judgment "having considered all the evidence and having construed the evidence most strongly in favor of the nonmoving party * * *." We see no reason to conclude that the trial court failed to follow the mandate of Civ.R. 56(C).

{¶ 68} Failing to set forth reasons for summary judgment is not equivalent to granting summary judgment without first considering all the appropriate materials and, therefore, *Murphy* does not compel reversal here.

{¶ 69} As we held in *Sterling Contr. LLC v. Main Event Ent., LP*, 8th Dist. Cuyahoga No. 110965, 2022-Ohio-2138, ¶ 13:

> "Meaningful" appellate review occurs through resolution of the appellate arguments based on the applicable standard. * * * The trial court's decision, even if reasons for it were offered in the record, cannot be considered persuasive, much less dispositive, since we provide the trial court's decision no deference.

{¶ 70} To hold otherwise would cut against longstanding appellate practice in the state. Outside of our district, panels in the Fourth, Fifth, Ninth, Tenth and

---

[11] Ferguson claims that the trial court granted summary judgment "without addressing any of Ferguson's arguments to the contrary and without providing any legal reasoning or rationale for its conclusion." To the extent that Ferguson is claiming that the trial court failed to adequately consider any Civ.R. 56(C) material — as opposed to merely failing to address its consideration of Ferguson's arguments in a written opinion — he has not attempted to show what evidence the trial court did not adequately consider.

Eleventh Districts have also held that there is no general requirement under Civ.R. 56 or 52 that a trial court provide reasons for granting summary judgment. *See, e.g.*, *Shafer v. Russ Newman Ins. Agency*, 4th Dist. Highland No. 12CA11, 2013-Ohio-885, ¶ 8; *Portfolio Recovery Assocs., LLC v. Dahlin*, 5th Dist. Knox No. 10-CA-000020, 2011-Ohio-4436, ¶ 57; *Medina ex rel. Jocke v. Medina*, 9th Dist. Medina No. 20CA0044-M, 2021-Ohio-4353, ¶ 22; *Ferdinand v. Hamilton Local Bd. of Edn.*, 17 Ohio App.3d 165, 172, 478 N.E.2d 835 (10th Dist.1984); *Birmingham Assoc. v. Strauss*, 11th Dist. Geauga No. 2012-G-3111, 2013-Ohio-4289, ¶ 24. Appellate panels across the state have substantively heard appeals of summary judgment in the absence of a written trial-court opinion.[12] We have also routinely done so, even after *Murphy*. *E.g.*, *Smith v. Bd. of Cuyahoga Cty. Commrs.*, 8th Dist. Cuyahoga No. 86482, 2006-Ohio-1073, ¶ 29; *Jackson v. Huppert*, 8th Dist. Cuyahoga No. 97764, 2012-Ohio-2934, ¶ 12–22; *Kirby v. Clark Refining & Marketing, Inc.*, 8th Dist. Cuyahoga No. 85127, 2005-Ohio-2736, ¶ 13.

---

[12] *See Riley v. Supervalu Holdings, Inc.*, 1st Dist. Hamilton No. C-040668, 2005-Ohio-6996; *Hines v. Gary Bryant Constr.*, 2d Dist. Montgomery No. 14937, 1995 Ohio App. LEXIS 2589 (June 23, 1995); *Marion Plaza, Inc. v. Fahey Banking Co.*, 3d Dist. Marion No. 9-2000-59, 2001 Ohio App. LEXIS 793 (Mar. 6, 2001); *Shafer v. Russ Newman Ins. Agency*, 4th Dist. Highland No. 12CA11, 2013-Ohio-885; *Nelson v. Hill*, 5th Dist. Knox No. 10-CA-17, 2011-Ohio-2510; *Burns v. Burns Iron & Metal Co.*, 6th Dist. Sandusky No. S-12-024, 2013-Ohio-2024; *Cannell v. Taylor Rental Ctr.*, 7th Dist. Mahoning No. 94 C.A. 1, 1995 Ohio App. LEXIS 1359 (Mar. 31, 1995); *Manning v. Avon Lake*, 9th Dist. Lorain No. 06CA008958, 2008-Ohio-1000; *Bodnar v. Hawthorn of Aurora L.P.*, 11th Dist. Portage No. 2006-P-0002, 2006-Ohio-6874; *Geier v. Crum*, 12th Dist. Brown No. CA91-10-016, 1992 Ohio App. LEXIS 3679 (July 13, 1992).

{¶ 71} A trial court's mere failure to set forth detailed reasons for granting summary judgment is simply not a basis for reversal. We, therefore, overrule Ferguson's first assignment of error.

{¶ 72} That said, we strongly encourage trial courts to explain a decision to grant summary judgment in a written opinion. Appellate courts do not afford these opinions any deference, but an opinion facilitates our review and allows litigants to focus their arguments before us. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, fn. 6, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("In many cases * * * findings are extremely helpful to a reviewing court."); *Scassa v. Dye*, 7th Dist. Carroll No. 02CA0779, 2003-Ohio-3480, ¶ 21 ("[T]he trial court's explanation of why it is granting summary judgment can only be helpful in reviewing the decision."). Providing a written opinion also "helps to promote confidence in the justice system to those who otherwise might feel that their case was given no consideration." *CitiMortgage, Inc. v. Tillman*, 9th Dist. Lorain No. 17CA011090, 2018-Ohio-629, ¶ 16 (Callahan, J., dissenting).

### B. Second Assignment of Error

{¶ 73} Ferguson contends that there are genuine disputes of material fact with respect to each of his claims and, therefore, the trial court erred in granting summary judgment in favor of University Hospitals.

{¶ 74} Ferguson asserted claims of disability discrimination, failure to accommodate and retaliation pursuant to the Ohio Civil Rights Act, R.C. 4112.02(A). Under R.C. 4112.02(A), it is "an unlawful discriminatory practice" "[f]or any

employer, because of the * * * disability * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." R.C. 4112.02(A). Because discrimination claims under federal law — including the ADA and Title VII of the Civil Rights Act of 1964 — are analogous to claims under the Ohio Civil Rights Act, we may look to federal cases interpreting federal discrimination laws to assist us in interpreting Ohio law. *See Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St.3d 569, 573, 697 N.E.2d 204 (1998); *McGuire v. Newark*, 5th Dist. Licking No. 2019 CA 00095, 2020-Ohio-4226, ¶ 96 ("Federal case law regarding Title VII * * * generally applies to R.C. Chapter 4112 violations, including retaliation claims.").

{¶ 75} As discussed above, we review summary-judgment rulings de novo applying the same standard as the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Under Civ.R. 56, summary judgment is appropriate when no genuine issue exists as to any material fact and, in viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party, entitling the moving party to judgment as a matter of law.

{¶ 76} On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate their entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292–93, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary

judgment is not appropriate; if the moving party meets this burden, the nonmoving party has the reciprocal burden to point to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact for trial. *Id.* at 293. Summary judgment is appropriate if the nonmoving party fails to meet this burden. *Id.*

### 1. Disability Discrimination

{¶ 77} To establish the prima facie case of disability discrimination under R.C. Chapter 4112(A), a plaintiff must show that: (1) they were disabled; (2) the employer took an adverse employment action against them at least in part because they were disabled and (3) though disabled, they can safely and substantially perform the essential functions of the job in question. *E.g., Anderson v. AccuScripts Pharm., LLC*, 8th Dist. Cuyahoga No. 110261, 2022-Ohio-1663, ¶ 44 (citation omitted); *see also Hood v. Diamond Prods.*, 74 Ohio St.3d 298, 302, 658 N.E.2d 738 (1996). If the plaintiff establishes a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Anderson* at ¶ 44 (citing *Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 2007-Ohio-6442, 879 N.E.2d 174, ¶ 14). If the employer articulates a nondiscriminatory reason, the burden shifts back to the plaintiff to show "that the proffered reason was not the true reason" for the adverse employment action. *Id.* (citation omitted).

{¶ 78} University Hospitals concedes, for purposes of this appeal, that Ferguson was disabled.

{¶ 79} The parties dispute whether working 12-hour shifts was an essential function of Ferguson's position. Even viewing the evidence most strongly in Ferguson's favor, reasonable minds could only conclude that it was an essential function.

{¶ 80} While the job description for the position does not specifically state that staff nurses must work 12-hour shifts, it does identify that a staff nurse's major responsibilities include, among other things, "adhere[nce] to organizational policy and procedure." Moreover, a previous version of the job description, which Ferguson attached to his briefing in the trial court in support of his argument, specifically identified that this responsibility includes, among other things, "adhere[nce] to the attendance policy" and "adhere[nce] to scheduled work hours as per department and hospital policy and procedures."

{¶ 81} Beyond the job description, it is clear that University Hospitals views a Medical-Surgical staff nurse's ability to work 12-hour shifts as an essential function of the job. Every nurse in the Medical-Surgical department worked 12-hour shifts after the merger with UH, and even those "combo shift" positions that included some eight-hour shifts were phased out within a year of the merger. The department's nurse managers and the facility's vice president of human resources described that scheduling an all-eight-hour shift in the 12-hour staffing model that existed after the merger would be disruptive to staffing schedules and would negatively affect continuity of care for patients. Everett described to Ferguson the "[c]onsiderable effort" that goes into ensuring adequate staffing to cover patient

needs without over-staffing, and the employee-morale issues that can arise when there is imbalance in the staffing.

{¶ 82} We do not give "blind deference" to University Hospitals' staffing judgment — *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 765 (6th Cir.2015) — but we also recognize the unique challenges UH faces in staffing its 24-hour Medical-Surgical department. *See, e.g.*, *Laurin v. Providence Hosp.*, 150 F.3d 52, 59–60 (1st Cir.1998) ("[A] 24-hour hospital unit imposes exceptional nurse-scheduling demands upon the hospital-employer. * * * The 24-hour hospital unit setting thus affords a particularly compelling context in which to defer to rational staffing judgments by hospital employers based on the genuine necessities of the hospital business.").

{¶ 83} Here, Ferguson does not point to evidence in the record that would create a genuine dispute about UH's staffing judgment. He does not explain how the hospital could have reasonably fit one nurse working eight-hour shifts into its staffing model. In his deposition, he testified that he did not know how it could be done:

> Q: * * * I'm asking how did you see that could possibly work. This is what you were asking for, right? This is what you wanted the hospital to do. How did you want them to do it?
>
> FERGUSON: That's not — that's not up to me. That's up to management and administration.
> * * *
>
> Q: Who would work when you came in for eight and left in a 12-hour shift program? How would they fill those other hours?

FERGUSON: That's — I don't know. That's not my problem.

Ferguson does not offer any further explanation in his summary judgment or appeal briefing; he simply says that it could have been done. As discussed above at paragraph 21, Ferguson admitted that other nurses on his floor would likely have had to add his patients to their full patient loads when he left at the end of his shift.

{¶ 84} All the nurses in Ferguson's department were required to work 12-hour shifts after the merger, without exception. UH's department supervisors explained why UH could not fit an eight-hour shift into that model without creating uneven coverage and negatively affecting patient care and Ferguson could not explain how UH was supposed to do so, either. Therefore, based on the record before us we find that working 12-hour shifts was an essential function of Ferguson's position. *See Mattingly v. Univ. of S. Fla. Bd. of Trs.*, 931 F.Supp.2d 1176, 1184 (M.D. Fla. 2013) (working 12-hour rotating shifts was an essential function of being a patrol officer in a police department where all such officers worked 12-hour shifts, with no exceptions, and "[s]horter shifts * * * would have disrupted the rotation for other officers and forced [the department] to deny shift preferences, change work schedules, * * * and limit the flexibility of the patrol division to respond to its operational needs and provide for public safety").

{¶ 85} University Hospitals disputes that it took an adverse employment action against Ferguson, instead arguing that Ferguson voluntarily resigned. It further disputes that Ferguson could safely and substantially perform the essential functions of his job, considering his doctor's opinion that he could not work 12-hour

shifts without pain and fatigue. Ferguson argues that University Hospitals effectively terminated him by placing him on leave and not allowing him to return to work. He further argues that he could safely and substantially work 12-hour shifts, albeit with discomfort. Even assuming that Ferguson could meet his burden to show a genuine dispute as to these elements of his prima facie case, University Hospitals is still entitled to summary judgment.

{¶ 86} University Hospitals articulated a legitimate, nondiscriminatory reason for placing Ferguson on administrative leave and not allowing him to return to work until he obtained medical clearance to work 12-hour shifts, with or without an accommodation. University Hospitals took these steps because (1) working 12-hour shifts was an essential function of being a staff nurse in the Medical-Surgical department and (2) Ferguson and his physician repeatedly told UH that Ferguson could not work more than eight hours without becoming pained and fatigued to the point of having difficulty ambulating and no accommodation could help him do so.

{¶ 87} Ferguson indicated in his initial formal request in January 2016 that "working 12 hours is just too long of a day for me standing." Dr. Jastrzemski certified that "walking/standing for extended periods of time create ambulatory difficulty" for Ferguson. He checked the box indicating his opinion that Ferguson's disability affects Ferguson's ability to perform any one of the essential functions of his job. He described that "walking or standing for more than 8 hrs a day can cause discomfort when ambulating."

{¶ 88} On March 30, 2016, Dr. Jastrzemski stated his opinion that Ferguson "cannot work more than 8 hrs." As discussed above at paragraph 28, Dr. Jastrzemski opined on the limitations under which Ferguson was cleared to work, and Ferguson admitted that these limitations were not compatible with the staff-nurse position.

{¶ 89} Nine days after receiving this form, UH informed Ferguson that Dr. Jastrzemski's opinions give UH concern that allowing Ferguson to continue working 12-hour shifts "could compromise your health, patient safety or patient care." Ferguson testified that he understood that UH's concern came from what Dr. Jastrzemski said about his medical condition and restrictions, but Ferguson never took steps to change Dr. Jastrzemski's assessment of his needed work limitations.

{¶ 90} When Ferguson met with UH's Employee Assistance staff, he again reported that he "had issues walking and standing and could not work a 12-hour shift." University Hospitals reached out to Dr. Jastrzemski about the doctor's opinion, telling the doctor that Ferguson had been working 12-hour shifts with minimal complaints but "needs to be medically cleared prior to returning." Dr. Jastrzemski again repeated his medical opinion that Ferguson "has difficulty standing on feet over 8 hrs per day."

{¶ 91} On May 23, Ferguson's counsel wrote to University Hospitals, again stating that "the longer shifts cause[] him ambulatory difficulty and discomfort."

{¶ 92} In June, University Hospitals sought additional information from Dr. Jastrzemski, asking for details about what risks Ferguson faces if he continues

working 12-hour shifts and asking the doctor if there were any possible accommodations that would allow Ferguson to work 12-hour shifts. Ferguson is copied on the letter, but he never discussed any of UH's suggested alternatives with his doctor. Instead, Dr. Jastrzemski responded and repeated that "longer breaks or rest periods will not likely benefit the employee/patient. He becomes fatigued after weightbearing for 8 hours."

{¶ 93} Even after University Hospitals stopped paying Ferguson and told him he needed to apply for FMLA leave, UH indicated that if Ferguson were cleared to work 12-hour shifts in his position, Ferguson would be able to do so. Ferguson still did not approach Dr. Jastrzemski to get clearance to work 12-hour shifts, or even to discuss whether there was some accommodation that could make 12-hour shifts work for him. Indeed, in September 2016 Dr. Jastrzemski repeated his opinions that Ferguson "is unable to work over 8 hours per day" and "12 hour shifts are not recommended."

{¶ 94} Ferguson now states that he can safely and effectively work 12-hour shifts, it is just uncomfortable and difficult for him. That may or may not be true; he did work 12-hour shifts for several months at UH, and then he did again for a little over a year at another hospital. But the argument ignores that Ferguson, his doctor and his counsel clearly — and at every opportunity — told University Hospitals that Ferguson could not work longer than eight hours at a time, and they proposed no accommodation that would allow him to work more than eight hours at a time. They repeatedly told University Hospitals that Ferguson experiences pain,

becomes fatigued and has difficulty ambulating after working for more than eight hours.  Ferguson was in a direct patient-care role; he routinely had to lift and move patients, among other things.  Whether or not Ferguson was successfully working 12-hour shifts, University Hospitals had a legitimate concern for its patients' safety — and for Ferguson himself — considering Dr. Jastrzemski's opinions and Ferguson's own statements about his medical condition.

{¶ 95} University Hospitals proposed several different accommodations to Ferguson, none of which Ferguson or his doctor indicated would alleviate their concerns.  Before Dr. Jastrzemski firmly opined on March 30 that Ferguson could not work *any* 12-hour shifts and would have to work under significant limitations incompatible with the staff-nurse position, University Hospitals proposed holding one of the "combo" shifts open, which would have Ferguson working some eight-hour shifts during the week (at least temporarily).  After Ferguson declined, and his doctor opined again that Ferguson could not work over eight hours at all, University Hospitals proposed giving Ferguson longer rest breaks.  When these proposed accommodations did not alleviate the concerns, UH asked the doctor if there was anything at all that would allow Ferguson to work 12-hour shifts.  Ferguson and Dr. Jastrzemski did not even talk about what might work and they certainly never proposed any accommodation to UH beyond allowing Ferguson to work all eight-hour shifts.

{¶ 96} Even viewing the evidence most strongly in Ferguson's favor, reasonable minds could only conclude that University Hospitals had compelling

reason to believe that allowing Ferguson to continue working 12-hour shifts in his staff nurse position was not medically authorized by Ferguson's physician and put himself, and UH's patients, at risk. That proffered reason for placing Ferguson on leave and not allowing him to return pending medical clearance is legitimate and nondiscriminatory.

{¶ 97} Ferguson argues that this stated reason was mere pretext. A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct or (3) was insufficient to warrant the challenged conduct. Regardless of which option is chosen, the plaintiff must produce sufficient evidence from which the trier of fact could reasonably reject the employer's explanation and infer that the employer intentionally discriminated against him. *E.g., Knepper v. Ohio State Univ.*, 10th Dist. Franklin No. 10AP-1155, 2011-Ohio-6054, ¶ 12. At this step, the employee must show both that the employer's reason was false and that discrimination was the real reason. *E.g., Kenner v. Grant/Riverside Med. Care Found.,* 2017-Ohio-1349, 88 N.E.3d 664, ¶ 29 (10th Dist.). The employee must show more than mere conjecture that the employer's stated reason is a pretext for the court to deny the employer's motion for summary judgment. *E.g., Powers v. Pinkerton, Inc.*, 8th Dist. Cuyahoga No. 76333, 2001 Ohio App. LEXIS 138, ¶ 11. (Citation omitted.)

{¶ 98} Ferguson argues that there are 12 facts that would allow a reasonable factfinder to determine that UH's stated reason was pretext. We have carefully considered each, and they individually and collectively do not present a sufficient

basis from which a reasonable factfinder could find pretext. The arguments fall into several categories, which we deal with in turn.

{¶ 99} Ferguson's first argument is that a reasonable factfinder could find pretext based on University Hospitals' consideration of Ferguson's performance on the job. Ferguson contends that he had no performance issues and his performance was not reasonably related to his request for an accommodation, so UH should not have been considering his performance in the first place in connection with his request. He further argues that UH mischaracterized his performance by alleging two "informal accommodations" that Ferguson was supposedly already receiving to help him do his job. The evidence relevant to these allegations are discussed above at paragraphs 23–25.

{¶ 100} Even viewing the evidence in Ferguson's favor, no reasonable factfinder could find pretext from UH's consideration of Ferguson's performance. Everett testified that an employee's performance is always considered during UH's consideration of a reasonable-accommodation request, and Ferguson offers no evidence to challenge that testimony. Among other reasons, Everett testified that if an employee is having difficulties because of a "physical situation," those difficulties could manifest themselves in documented performance issues. Therefore, while documented performance issues are "[n]ot as relevant as * * * some of the other indicators regarding the request," UH routinely includes a consideration of performance issues when it evaluates accommodation requests.

{¶ 101} Moreover, it is clear from UH's communications with Ferguson — and Ferguson acknowledged at deposition — that the reason UH sent Ferguson for a fitness-for-duty evaluation, placed him on leave and did not allow him to return was that Ferguson's doctor did not medically clear Ferguson to work 12-hour shifts. The decision was not the result of any alleged performance issues. UH's April 8 letter states that the doctor's opinions about Ferguson's medical condition led to concerns about Ferguson's and patient safety, and Ferguson testified that he understood that the letter resulted from his doctor's medical opinion. When Employee Assistance reached out to Ferguson's doctor to discuss his fitness for duty, they specifically noted that Ferguson denied performance issues, had been working 12-hour shifts with minimal complaints and was well-liked. When Employee Assistance referred the matter back to the human-resources department, Fulton notified Ferguson that his doctor did not change his return-to-work recommendation. In UH's communications with Ferguson and Dr. Jastrzemski after the fitness-for-duty exam, the discussion focuses solely on why Ferguson could not work 12-hour shifts and what possible accommodations would allow Ferguson to work 12-hour shifts. No reasonable factfinder could find pretext from these facts.

{¶ 102} Ferguson's second argument is that a reasonable factfinder could find pretext from the circumstances surrounding Everett's April 8 letter indicating that UH had concerns about Ferguson's fitness for duty. Specifically, Ferguson points out that Everett drafted the letter in February, before Dr. Jastrzemski's March 30 statement of Ferguson's limitations. He points out that the Employee

Assistance staff conducting the fitness-for-duty examination apparently had a copy of this drafted, but-unsent, letter and stated that Ferguson may be in "denial" or have "cognitive issues" because Ferguson said he did not receive the letter. He argues that these facts show a coordinated plan to drum up false reasons for terminating him.

{¶ 103} Even viewing the evidence in Ferguson's favor, no reasonable factfinder could find pretext from the undisputed facts. When Everett drafted this letter, Ferguson's doctor had already indicated that Ferguson's medical condition caused him difficulty ambulating and discomfort after working for longer than eight hours. The doctor confirmed this opinion and went even further in limiting Ferguson's work conditions before the letter was finalized and sent. That alone is fatal to any finding of pretext. But there is no basis beyond mere conjecture to find pretext based on the letter's timing or the discussion of the letter in the fitness-for-duty examination either. Ferguson does not dispute that Everett went on vacation after drafting the letter and by the time Employee Assistance spoke with Ferguson about the letter, the final draft had been sent out and Everett had discussed the letter's contents with Ferguson, in person. After the examination, Everett confirmed to Employee Assistance that Ferguson was correct when he said he did not receive the draft letter. No reasonable factfinder could find pretext from these facts.

{¶ 104} Ferguson's third argument is that a reasonable factfinder could find pretext because Everett denied at his deposition and by affidavit that Ferguson's first request for an accommodation was due to a disability. Everett explained at

deposition that Ferguson's initial request had to do with nonmedical reasons and at some point, before January 5, Ferguson came back to Everett and said he physically could not work over eight hours a day. Everett presumed that the request had to do with Ferguson's noticeable issue with his gait. While there is a factual dispute about why Ferguson initially requested his accommodation, Everett and UH have consistently admitted that Ferguson made a request for a disability accommodation. As early as January 5, 2016, Everett provided Ferguson ADA paperwork to process his request. UH communicated back-and-forth with Ferguson's doctor for months to see if there was some reasonable accommodation that would allow Ferguson to work 12-hour shifts. No reasonable factfinder could draw an inference of pretext from Everett's disputed claim about the content of Ferguson's first request.

{¶ 105} Ferguson's fourth argument is that a reasonable factfinder could find pretext because it was unreasonable for UH to read Dr. Jastrzemski's January and March 2016 medical forms as requiring Ferguson's immediate removal from his job, when UH admits that Ferguson had been working 12-hour shifts without complaint from January through April. Contrary to Ferguson's argument, it is not inconsistent for UH to acknowledge that Ferguson was working 12-hour shifts without incident while at the same time claiming that the information Dr. Jastrzemski provided caused them concern about his safety and patient safety. Even if University Hospitals' administrators subjectively believed that Ferguson could safely do the job and was malingering, UH was not required to bear the risk of being incorrect.

{¶ 106} Considering the information Dr. Jastrzemski provided — and Ferguson's acknowledgment that the work limitations Dr. Jastrzemski dictated were not compatible with his position — no reasonable factfinder could find that University Hospitals' stated reasoning for its actions were false or that UH was actually motivated by discrimination.

{¶ 107} Ferguson's fifth argument is that a reasonable factfinder could find pretext because Ferguson was subjected to drug testing and "psychological examination" during his fitness-for-duty evaluation. As for drug testing, it is undisputed that all employees referred to Employee Assistance undergo toxicology screening. As for the content of the examination, there is no firsthand account of the examination in the record from Ferguson's point of view. Based on Fulton's notes, though, she used a standard intake form during the meeting. In completing this form, she noted that Ferguson denied psychological issues and she indicated her observation that Ferguson's thoughts, orientation, mood, affect, intellectual level, memory, insight and judgment were all normal and appropriate. Fulton was concerned about Ferguson's claim that he had not received Everett's letter but Everett confirmed to her that Ferguson was correct in that regard. There is no evidence suggesting that University Hospitals took any adverse action against Ferguson based on alleged psychological issues. No reasonable factfinder could infer pretext from the nature of this examination, based on this record.

{¶ 108} Finally, Ferguson argues that a reasonable factfinder could infer pretext from University Hospitals' decisions to allow certain employees to be

"grandfathered in" to full-time status and to allow certain nurses to retain some eight-hour shifts on the "combo shift." Ferguson essentially argues that if University Hospitals could afford that flexibility, there is no legitimate reason that UH could not afford Ferguson the flexibility of allowing him to work all eight-hour shifts, and UH's refusal to do so must, therefore, be motivated by discrimination. University Hospitals' policy of "grandfathering" at Robinson related to how many hours per week an employee needed to work to be considered full-time through the end of 2016; it had nothing to do with the length of employees' shifts. As for the "combo shift," Ferguson does not explain why the existence of this shift would allow Ferguson to reasonably work all eight-hour shifts. No reasonable factfinder could find pretext from these facts.

{¶ 109} While each argument for pretext fails on its own merits for the reasons discussed above, we also note that each is further and fatally undercut by the undisputed fact that University Hospitals repeatedly told Ferguson that he could return to work — working 12-hour shifts — if only he received medical clearance to do so. No reasonable factfinder would conclude that UH's stated reason for its actions was false, did not actually motivate UH's conduct or was insufficient to warrant the conduct. Ferguson has thus failed to demonstrate a genuine issue of material fact that could lead a reasonable factfinder to conclude that UH's legitimate, nondiscriminatory reason for its actions was mere pretext.

{¶ 110} We, therefore, overrule Ferguson's second assignment of error as it relates to the summary judgment on Ferguson's disability-discrimination claim.

## 2. Failure to Accommodate

{¶ 111} Under Ohio law, "[a]n employer must make reasonable accommodation to the disability of an employee * * *, unless the employer can demonstrate that such an accommodation would impose an undue hardship on the conduct of the employer's business." *E.g.*, *Anderson v. Ohio Bell Tel. Co.*, 8th Dist. Cuyahoga Nos. 106992 and 107399, 2018-Ohio-5237, ¶ 6 (Citation omitted); Ohio Adm.Code 4112-5-08(E)(1). "Whether an accommodation is reasonable is a mixed question of law and fact." *Ohio Civ. Rights Comm. v. Case W. Res. Univ.*, 76 Ohio St.3d 168, 178, 666 N.E.2d 1376 (1996).

{¶ 112} A plaintiff claiming a failure to accommodate bears the initial burden to show that (1) they are disabled; (2) they are otherwise qualified for the position (with or without a reasonable accommodation); (3) their employer knew or had reason to know about the disability; (4) they requested an accommodation and (5) the employer failed to provide the necessary accommodation. *Stewart v. Bear Mgt.*, 2017-Ohio-7895, 98 N.E.3d 900, ¶ 21 (5th Dist.). If the employee makes this prima facie showing, the burden of production shifts to the employer to show that the accommodation would constitute an undue hardship. *Mosby-Meachem v. Memphis Light, Gas & Water Division*, 883 F.3d 595, 603 (6th Cir.2018).

{¶ 113} Here, Ferguson has not established his prima facie case because he has not shown that he is otherwise qualified for the staff-nurse position with, or without, a reasonable accommodation.

**{¶ 114}** As we discussed above at paragraphs 80–84, working 12-hour shifts is an essential function of being a staff nurse in University Hospitals' Medical-Surgical department. Every staff nurse in the Medical-Surgical department worked 12-hour shifts after January 1, 2016. Whether or not Ferguson could, in fact, work 12-hour shifts safely and effectively, his own chosen physician would not medically clear him to do so. When University Hospitals proposed various accommodations, including longer rest breaks, Ferguson and his physician did not report that those proposals would alleviate their health concerns or propose any accommodations that could allow Ferguson to work 12-hour shifts. Therefore, Ferguson was not qualified for his staff nurse position, with or without reasonable accommodation. *See Szabla v. St. John Hosp.*, Case No. 09-13042, 2011 U.S. Dist. LEXIS 94703, 19–20 (E.D. Mich. Aug. 24, 2011) (employee not qualified for a hospital position requiring 12-hour shifts where she was medically restricted from working 12-hour shifts); *Boitnott v. Corning*, Case No. 7:06-CV-0030, 2010 U.S. Dist. LEXIS 59269, 29–34 (W.D. Va. June 15, 2010) (where employee could not work the rotating 12-hour shifts required of a maintenance engineer, the employee was not qualified and "the ADA did not require [the employer] to tailor a new schedule" for the employee); *Kallail v. Alliant*, Case No. C10-0063, 2011 U.S. Dist. LEXIS 51705, 30–50 (N.D. Iowa May 13, 2011) (employee's medical restriction requiring a permanent eight-hour day shift rendered her unable to carry out the essential functions of a position requiring rotating shifts that included 12-hour shifts).

{¶ 115} Ferguson's only requested accommodation was to work all eight-hour shifts. He acknowledged that the accommodation would likely involve other staff nurses picking up his patients in addition to their own full patient loads for four hours after the end of his shift. This is not a reasonable accommodation and University Hospitals was not required to assign other nurses to cover Ferguson's patients for four hours at the end of each of his shifts in order to accommodate him. *See White v. Std. Ins. Co.*, 529 Fed.Appx. 547, 550 (6th Cir.2013) (request to work part-time not reasonable when doing so would require other employees to pick up the plaintiff's accounts for four hours at the end of every shift); *Green v. BakeMark USA*, 683 Fed.Appx. 486, 493 (6th Cir.2017) (employer not obligated to bring in "other operations managers to work part of the day" for an employee who requested to work part-time).

{¶ 116} Even if Ferguson could have established his prima facie case, University Hospitals' department supervisors discussed the various ways in which accommodating Ferguson would negatively affect the department — both its staff and its patients. Ferguson, by contrast, points to no evidence establishing that the accommodation would not have been an undue hardship.

{¶ 117} Having found that Ferguson was not qualified for the staff nurse position and did not propose a reasonable accommodation, and that Ferguson's requested accommodation would have imposed an undue hardship on University Hospitals, even it had been reasonable, we overrule Ferguson's second assignment

of error as it relates to the summary judgment on Ferguson's disability-discrimination claim.

### 3. Retaliation

{¶ 118} To establish a prima facie case for Ohio Civil Rights Act retaliation, Ferguson must establish that (1) he engaged in protected activity; (2) his employer knew of his participation in the protected activity; (3) he suffered an adverse employment action and (4) a causal link existed between the protected activity and the adverse action. *Johnson v. Cleveland City School Dist.*, 8th Dist. Cuyahoga No. 94214, 2011-Ohio-2778, ¶ 67, citing *Willie v. Hunkar Laboratories, Inc.*, 132 Ohio App.3d 92, 107–108, 724 N.E.2d 492 (1st Dist.1998); *see also Johnson v. Univ. Hosp. Physician Servs.*, 617 Fed.Appx. 487, 492 (6th Cir.2015). Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *Id.* If the employer does so, the burden shifts back to the plaintiff to show that the articulated reason was a pretext. *Id.*

{¶ 119} Ferguson claims that he engaged in protected activity by requesting a reasonable accommodation for his disability, and he says University Hospitals retaliated against him for doing so by placing him on involuntary leave and not allowing him to return to work, essentially terminating him.

{¶ 120} Requesting a reasonable accommodation for a disability is a protected activity. *Johnson v. Cleveland City School Dist.,* 8th Dist. Cuyahoga No. 94214, 2011-Ohio-2778, ¶ 68; *see also A.C. ex rel. J.C. v. Shelby Cty. Bd. of Edn.,* 711

F.3d 687, 698 (6th Cir.2013) ("Both this circuit and most others agree that requests for accommodation are protected acts" under the ADA). Here, Ferguson did request an accommodation for a disability, and University Hospitals knew about his request. Even assuming that Ferguson could meet the other elements of his prima facie case, though, University Hospitals is entitled to summary judgment. Ferguson's claim fails for the same reason his discrimination claim fails — University Hospitals had a legitimate, nondiscriminatory reason for taking the actions it did, and Ferguson has not identified a genuine issue of material fact that would allow a reasonable factfinder to reject UH's explanation and find pretext.

{¶ 121} As further stated above at paragraphs 86–96, University Hospitals took the actions it did because Ferguson and his physician informed the hospital that Ferguson could not work more than eight hours without becoming pained and fatigued to the point of having difficulty ambulating, and because UH could not reasonably accommodate all eight-hour shifts for Ferguson. University Hospitals told Ferguson that Ferguson could return to work, working 12-hour shifts, if Ferguson were medically cleared to do so. As discussed above at paragraphs 97–109, Ferguson has not identified sufficient evidence in the record from which a reasonable factfinder could find that UH's stated reason was pretext. Therefore — even viewing the evidence most strongly in Ferguson's favor — reasonable minds could only conclude that University Hospitals had a legitimate, nonretaliatory reason for taking the actions it took regarding Ferguson.

{¶ 122} We, therefore, overrule Ferguson's second assignment of error as it relates to the summary judgment on Ferguson's retaliation claim.

## III. Conclusion

{¶ 123} Having overruled each of Ferguson's assignments of error for the reasons stated above, we affirm the trial court's summary judgment in favor of University Hospitals.

It is ordered that the appellee recover from the appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

SEAN C. GALLAGHER, A.J., and
EMANUELLA D. GROVES, J., CONCUR